E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
PATRICK CASTAÑEDA (Cal. Bar No. 319431)
JASON C. PANG (Cal. Bar No. 296043)
SURIA M. BAHADUE (Cal. Bar No. 344369)
Assistant United States Attorneys
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0637/2652/5487
     Facsimile: (213) 894-0141
     E-mail:    Patrick.Castaneda@usdoj.gov
                Jason.Pang@usdoj.gov
                Suria.Bahadue@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 21-CR-00244(B)-AB |
|---|---|
| Plaintiff, | GOVERNMENT'S MOTION IN LIMINE NO. 2 TO ADMIT 911 CALLS; DECLARATION OF SURIA M. BAHADUE; EXHIBITS A-D |
| v. | |
| MIRELA TODOROVA, | Hearing Date: November 22, 2024 |
| Defendant. | Hearing Time: 1:30pm<br>Location:    Courtroom of the Hon. André Birotte Jr. |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Patrick Castañeda, Jason C. Pang, and Suria M. Bahadue, hereby files its Motion in Limine No. 2 to Admit 911 Calls.

This motion is based upon the attached memorandum of points and authorities, the files and records in this case, the declaration of Suria M. Bahadue and accompanying exhibits, and such further evidence and argument as the Court may permit.

Dated: November 1, 2024          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division


        /s/
PATRICK CASTAÑEDA
JASON C. PANG
SURIA M. BAHADUE
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Defendant Mirela Todorova ("defendant") led a deadly drug-trafficking conspiracy selling and delivering fentanyl-laced drugs that resulted in R.M.'s death and three near-fatal overdoses of B.H., S.L., and H.A. in less than two months. At trial, the government seeks to admit four 911 calls reporting each overdose and seeking emergency assistance for each victim in this case. The 911 calls constitute present sense impressions and excited utterances, and thus are admissible under Rules 803(1) and 803(2). In addition, the calls themselves are self-authenticating and can be admitted as a business or public record. Nor do the calls run afoul of Rule 403. The government must prove beyond a reasonable doubt that defendant's drugs were the only source that caused the death or serious bodily injury of each victim. The calls are highly probative of those facts and that significant probative value is not substantially outweighed by unfair prejudice. Accordingly, this Court should grant the government's motion.

### II. RELEVANT BACKGROUND

At trial, the government seeks to admit four 911 calls reporting each victim's condition and the need for emergency assistance.

First, on November 16, 2020, D.G. called 911 to report R.M.'s overdose. (Ex. A.) On that call, D.G. told the dispatcher that he "came to check up" on R.M. and that R.M. was "on the floor." (Id. at 1:26-30.) The dispatcher asked for more information, and D.G. described what he was seeing in real time: "I don't know, he's passed out. Um. I came in, he's cold, he's stiff, he's purple, he's cold." (Id. at 1:52-2:00.) After confirming D.G. was "next to" R.M., the

dispatcher asked if R.M. was "awake at all" to which D.G. replied "no, he's not." (Id. at 2:15-20.)  Similarly, the dispatcher asked if R.M. was breathing, and D.G. replied "no, he's not breathing." (Id. at 2:25-31.)  The dispatcher then began to provide CPR instructions; as D.G. attempted to follow them, he uttered, "oh my god no he's so stiff . . . He's like stiff stiff." (Id. at 3:54-4:03.)  Based on that information, the dispatcher told D.G. to not perform CPR and to wait until help arrived. (Id. at 4:06-32.)

Second, on November 26, 2020, L.H. and a friend called 911 to report B.H.'s overdose. (Ex. B.)  After confirming his address, L.H. explained that his "wife is currently unconscious" and that "she is not waking up, she's unresponsive." (Id. at 00:30-00:48.)  The dispatcher followed up, asking if she was breathing normally to which L.H. answered "no." (Id. at 00:48-00:53.)  The dispatcher then began to walk L.H. through CPR; as L.H. and the friend followed those instructions, the dispatcher asked if the victim had any "medical problems" like "drug use" and L.H. replied, "drug use." (Id. at 1:48-2:12.)  The friend then spoke to the dispatcher and explained that "a little bit ago . . . she popped a pill" and they "were drinking a little." (Id.)  The dispatcher then turned back to giving CPR instructions; while both L.H. and the friend followed those instructions, the friend can be heard urging B.H. to "stay with us." (Id. at 3:04-07.)  As the call continued, the dispatcher continued to provide CPR instructions while both L.H. and the friend can be heard following them and urging B.H. to wake up and to "come back." (Id. at 4:08-4:17.)  The call ended once paramedics arrived.

2

Third, on December 12, 2020, one of S.L.'s friends called 911 to report S.L.'s and another's overdose. (Ex. C.) After asking for biographical information and confirming the caller's belief it was an overdose and the caller was with the victims "right now," the paramedic asked if "he was awake" (referring to the victim) to which the caller replied, "neither of them are awake." (Id. at 1:18-23.) The paramedic asked if the caller could wake them up; frustrated, the caller replied, "I can't wake them up. That's why I am calling." (Id. at 1:22-26.) The paramedic then confirmed that two people needed help and asked if they were both unconsciousness, and the caller reported that both were "breathing but they're unconscious" and "they're not breathing normally." (Id. at 1:29-48.) Next, the paramedic instructed the caller to perform CPR. (Id. at 2:11-2:21.) The caller confirmed that he was following those instructions, that he saw the victims' chests "rising and falling normally," and that the victims remained "unconscious." (Id. at 2:38-2:50.) The paramedic then asked to hear the victims' breathing, and after a brief pause moment, again instructed the caller to do CPR. (Id. at 2:50-3:05.) The paramedic provided CPR instructions, and the call ended once paramedics arrived.

Fourth, on January 9, 2021, 911 called C.C. who reported H.A.'s overdose. (Ex. D.) C.C. picked up and faintly said "hello." (Id. at 00:6-00:08.). On this recording, C.C. is audibly upset. (See generally id.) When the dispatcher confirmed the address, C.C. responds "yes" while crying. (Id. at 00:17-00:24.) The dispatcher then asked what was "happening right now," and after a few seconds of crying without a verbal response, C.C. replied, "my friend won't wake

3

up." (Id. at 00:25-35.) C.C. then reported that H.A. was not awake and not breathing normally. (Id. at 00:40-45.)

Next, the dispatcher walked C.C. through CPR. The dispatcher asked if H.A. was on the floor, and C.C. confirmed that she was in bed. (Id. at 00:46-49.) The dispatcher then asked to "pull her out of bed onto the floor so we can start CPR for her." (Id. at 00:50-55.) While audibly breathing heavily and crying, C.C. said "yes" and the dispatcher repeated "go ahead and pull her on the floor." (Id. at 00:57-1:04.) The dispatcher can next be heard counting, while C.C. can be heard performing CPR. (Id. at 2:22-32) The dispatcher then asked if there was "any vomit or fluid in her mouth?" and C.C., while crying, told the dispatcher that H.A.'s "lips are blue" but "she's making sounds now." (Id. at 2:36-43.) The dispatcher then asked if H.A. was awake and breathing normally, and C.C. replied "no." (Id. at 2:50-55.) The dispatcher continued to walk C.C. through CPR, as C.C. continued to cry but follow directions. (Id. at 2:59-3:35.) The dispatcher again asked if there is any vomit or fluid in the victim's mouth, and C.C. exclaimed, "yes!" (Id. at 3:35-43.) The dispatcher continued to walk C.C. through helping H.A. before paramedics arrived. (Id. at 3:47-4:27.)

### III. ARGUMENT

**A.   The 911 Calls Are Admissible as Present Sense Impressions**

The present sense impression exception to the hearsay bar applies to any "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). "Unsurprisingly, 911 calls that would otherwise be inadmissible hearsay have often been admitted" as

4

present sense impressions.  Navarette v. California, 572 U.S. 393, 400 (2014); see, e.g., Bemis v. Edwards, 45 F.3d 1369, 1372 (9th Cir. 1995) (applying present sense impression exception to affirm admission of 911 call); United States v. Barela, 2022 WL 17844173, at *2 (9th Cir. 2022) (unpublished) (same).

It is not necessary for a crime to be ongoing at the time of the 911 call for the present sense impression exception to apply. Indeed, the commentary to the rule "recognizes that in many, if not most, instances precise contemporaneity is not possible and hence a slight lapse is allowable."  Fed. R. Evid. 803, adv. comm. n. Statements "made after" perceiving an event may constitute present sense impressions so long as there is "substantial contemporaneity of event and statement."  Navarette, 572 U.S. at 400; Fed. R. Evid. 803, adv. comm. n.  Pursuant to that standard, courts have routinely applied the present sense impression exception to witness statements made on 911 calls immediately after a crime.  See, e.g., United States v. Lovato, 950 F.3d 1337, 1339 (10th Cir. 2020) ("man called 911 to report that he witnessed two men in a Honda shoot at another car"); United States v. Dean, 823 F.3d 422, 427-28 (8th Cir. 2016) (assault victim's statements were recorded on 911 call and officer's bodycam microphone); United States v. Polidore, 690 F.3d 705, 720-21 (5th Cir. 2012) (caller made statements to 911 as he was observing defendant's drug dealing "or shortly thereafter"); United States v. Davis, 577 F.3d 660, 669 (6th Cir. 2009) (shortly after event, 911 caller reported seeing defendant with a gun).

Here, each 911 call reflects the caller's present sense impressions.  Each caller is describing an event -- finding a victim

unconscious or unable to breathe -- and the victims' condition while they are perceiving it in real time. (See, e.g., Ex. A at 1:52-2:00 (D.G. stating "I don't know, he's passed out. Um. I came in, he's cold, he's stiff, he's purple, he's cold" in reference to R.M.); Ex. B at 00:30-00:48 (describing B.H. as "currently unconscious," "not waking up, and "unresponsive"); Ex. C at 1:29-48 (describing S.L. and roommate as "breathing but they're unconscious" and "they're not breathing normally"); Ex. D at 2:36-43 (describing H.A.'s "lips are blue" but "she's making sounds now").) All of the callers are reporting ongoing emergencies as they are happening. Consequently, these calls concern statements "describing or explaining an event or condition, made while or immediately after the declarant perceived it," Fed. R. Evid. 803(1), and thus are admissible as present sense impressions.

The fact that other statements on the 911 calls consist of the callers providing information is of no moment. None of the background information provided in response to the 911 operators' questions is hearsay because that information would not be introduced at trial to prove its truth. Fed. R. Evid. 801(c)(2); see United States v. Barragan, 871 F.3d 689, 705 (9th Cir. 2017) (recorded statements offered for context, not their truth, were not hearsay). For example, the government need not prove the victim's name or address or any other identifying information. Moreover, the dispatcher's CPR instructions or imperatives are not assertions of fact and thus are not hearsay. United States v. Waters, 627 F.3d 345, 358 (9th Cir. 2010). Accordingly, the 911 calls articulating the callers' present sense impressions are admissible.

6

**B.     The 911 Calls are Admissible as Excited Utterances**

The excited-utterance exception also applies to 911 calls. Navarette, 572 U.S. at 400; see also United States v. Bickerstaff, 851 F. App'x 605, 610 (6th Cir. 2021) ("[A] 911 call made within minutes of the event is sufficiently contemporaneous to qualify under either the excited utterance or present-sense impression hearsay exceptions." (quotation marks omitted).); United States v. Vazquez, 818 F. App'x 93, 95 (2d Cir. 2020) (911 call made by hostage victim while defendant was in the shower "easily qualifie[d]" under both present sense impression and excited utterance exceptions).  And in one sense, the excited utterance exception is even "broader" because it includes statements "relating to" startling events, while the present sense impression exception is limited to statements "describing or explaining" the event.  United States v. Boyce, 742 F.3d 792, 797-98 (7th Cir. 2014).

A statement qualifies as an excited utterance if (1) there was an occurrence startling enough to produce nervous excitement and render an utterance spontaneous and unreflecting; (2) the utterance was expressed before there had been time to contrive and misrepresent; and (3) the utterance related to the circumstances of the occurrence.  United States v. Alarcon-Simi, 300 F.3d 1172, 1175 (9th Cir. 2002).

Here, the 911 calls also qualify as excited utterances.  Each stem from finding a friend or a loved one unconscious, which plainly is startling enough to produce nervous excitement and render an utterance spontaneous and unreflecting.  And each event did produce such responses.  Each caller expressed nervousness, surprise,

7

frustration, fear, shock, and concern over what they were reporting. (See, e.g., Ex. A at 3:54-4:03 (D.G. uttering "oh my god no he's so stiff . . . He's like stiff stiff" when asked to perform CPR); Ex. B at 3:04-07 (Friend urging B.H. to "stay with us"); Ex. C at 1:22-26 (expressing frustration and reiterating that he cannot "wake them up"); Ex. D (audibly sobbing throughout call). The other two factors also support application of the excited utterance exception here. As to the second factor, the callers expressed their utterances before there had been time to contrive and misrepresent, as they were reporting in real time what was happening. As to the third factor, the callers' utterances all relate to the circumstances of the occurrence. Each caller was describing what they were seeing as it was happening. Thus, even if not admissible as present sense impressions, the calls are admissible as excited utterances.

**C.   The Recording Itself is Self-Authenticating and Non-Hearsay**

Finally, the Court should conclude that the recordings of the 911 calls themselves are self-authenticating and non-hearsay. The Ninth Circuit has instructed that "a 911 tape can be admitted into evidence as either a 'public record,' Fed. R. Evid. 803(8)(B), or a 'business record,' Fed. R. Evid. 803(6)." Bemis v. Edwards, 45 F.3d 1369, 1372 (9th Cir. 1995) (collecting cases); see also Barnes v. Montgomery County, 2012 WL 13012456, at *2 (D. Md. July 9, 2012) (noting that courts routinely admit 911 tapes because, "as public records, they are self-authenticating"). In this case, an appropriate custodian has certified, or will certify, the recordings of the 911 calls and has prepared, or will prepare, a Rule 902(11) declaration for them.

8

**D. The 911 Calls Comply with Rule 403**

Rule 403 permits the Court to exclude evidence if its probative value is "substantially outweighed" by the danger of "undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Application of Rule 403 must be cautious and sparing, however, because the Rule's major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." United States v. Plascencia-Orozco, 852 F.3d 910, 926 (9th Cir. 2017) (quotation marks omitted). Because "relevant evidence is inherently prejudicial," it is "only unfair prejudice, substantially outweighing probative value" that justifies "exclusion of relevant matter under Rule 403." United States v. Hankey, 203 F.3d 1160, 1172 (9th Cir. 2000).

Here, the probative value of each call is substantial. The callers recount exactly what they are seeing, including each victim's condition and the severity of that condition. The government has to prove that each victim's use of defendant's drugs caused death or serious bodily injury, and the callers' descriptions of the victims as blue, unconscious, stiff, and/or not breathing speak exactly to that point. Further, each call helps dispel an anticipated defense that any of the callers served as alternate sources of the drugs that each victim ingested or engaged in any wrongdoing.

That significant probative value is not substantially outweighed by the risk of unfair prejudice, the risk of wasted time, or the presentation of needless cumulative evidence. As for prejudice, the 911 calls are not unfairly prejudicial, and the Ninth Circuit has admitted far more prejudicial evidence than 911 calls reporting

9

overdoses.  See, e.g., United States v. Daly, 974 F.2d 1215, 1217 (9th Cir. 1992) (evidence that defendant engaged in an eleven hour shoot-out with officers was more probative than prejudicial in a felon-in-possession case); United States v. Bradshaw, 690 F.2d 704, 709 (9th Cir. 1982) (admitting evidence that defendant drugged and sexually exploited a child both before and after kidnapping him because it showed defendant's motive and negated a defense that the victim consented).  Moreover, the 911 calls are less sensitive than other evidence the government plans to admit, such as images of R.M.'s body found at the scene.  United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999) (Generally "[e]vidence will not be excluded as unduly prejudicial when it is not more inflammatory than the charged crime.").  Moreover, each of the calls are of short duration and will take hardly any time at all to play for the jury.  Accordingly, the 911 calls do not run afoul of Rule 403 and should be admitted.

**IV.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court grant the government's motion.